# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ENCAP, LLC,

        Plaintiff,

    v.                              Case No. 11-C-685

THE SCOTTS COMPANY, LLC, et al.,

        Defendants.

---

## DECISION ON CLAIM CONSTRUCTION

---

Plaintiff Encap, LLC filed this action for patent infringement and misappropriation of trade secrets against the Scotts Company, LLC, The Scotts Miracle-Gro Company, LLC, and OMS Investments, Inc. (collectively, "Scotts") on July 18, 2011. The case is before the Court for claim construction on U.S. Patent Nos. 7,412,878 (the '878 patent) and 8,474,183 (the '183 patent). The patents at issue are method patents which instruct a user when to start and stop watering grass seed or similar plant life. For the '878 patent, an indicator is placed on the surface of the soil along with seed to indicate to a user based on the size and shape of the indicator when it is time to start and stop watering. The '183 patent also signals to a user when to start and stop watering, but instead of a size-changing indicator, it utilizes a change in color intensity of mulch.

## PRINCIPLES OF CLAIM CONSTRUCTION

The interpretation and construction of patent claims are issues of law for the court to determine. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The overall purpose of claim construction is to clarify the meaning of disputed claim

terms and phrases so that the Court or, if there are factual disputes, a jury, can determine whether the claims are (1) valid and (2) infringed upon by the accused product. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (explaining that courts need only construe claim language "in controversy, and only to the extent necessary to resolve the controversy"). Claims are construed the same way for validity and infringement.[1] *Amgen Inc. V. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) (citations omitted).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal citations omitted). In construing claims, the court must evaluate the intrinsic evidence, including the claim language, the specifications, and the patent application. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc). The claim language defines the scope of the patent protection; accordingly, the court must place primary weight on the ordinary meaning of the claim terms "unless it appears the inventor used them otherwise." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619–20 (Fed. Cir. 1995) (citations omitted); *see also Merrill v. Yeomans*, 94 U.S. 568, 570 (1876) (stating that claims are "of primary importance, in the effort to ascertain precisely what it is that is patented.").

---

[1] Encap asserts that Scotts advocated broad claim constructions before the PTO and in its invalidity contentions but now attempts to narrow the constructions to avoid infringement. Different standards apply to PTO and district court proceedings, however, and as Encap readily admits, Scotts is not prohibited from advocating a narrower claim construction in this Court. (Pl's Opening Br. at 1, ECF No. 113.) In addition, it is not improper for Scotts to raise alternative or contingent arguments, as it has done with its invalidity contentions. The Court therefore rejects Encap's argument that Scotts has argued inconsistent positions or limited the scope of its arguments in the district court.

How a person of ordinary skill in the art understands the claim language provides an objective baseline for claim construction. *Phillips*, 415 F.3d at 1312–13. Because the person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent," claims must be read in view of the specifications of which they are a part. *See id.* at 1313, 1315. Thus, the claim specification is "highly relevant to the claim construction analysis" and "usually, it is dispositive." *Id.* at 1315; *see also Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("The specification is . . . the primary basis for construing the claims."); *United States v. Adams*, 383 U.S. 39, 49 (1966) ("[C]laims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention."). However, "the claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims" and is not limited "to his preferred embodiment" and the court will not "import a limitation from the specification into the claims." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning against confining the claims to preferred embodiments). On the other hand, "the claims cannot enlarge what is patented beyond what the inventor has described as the invention." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). If the specification reveals an intentional disclaimer or disavowal of claim scope by the inventor, however, "the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316; *Abbott Labs.*, 566 F.3d at 1288 ("T]his court may reach a narrower construction, limited to the embodiment(s) disclosed in the specification, when . . . the specification . . . clearly indicate[s] that the invention encompasses no more than that confined structure or method.").

3

The Court may also consider the patent's prosecution history, including reexamination proceedings, if it is in evidence. *Phillips*, 415 F.3d at 1317. The prosecution history, which is part of the "intrinsic evidence," consists of the "complete record of the proceedings before the USPTO and includes the prior art cited during the examination of the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* However, as the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," it is given less weight than the claim language and the specifications. *Id.*

Finally, the Court may consider, aside from the intrinsic evidence, extrinsic evidence including sources such as the testimony of experts and knowledgeable technical witnesses, dictionaries, and learned treatises. *Id.*; *Markman*, 52 F.3d at 980. Extrinsic evidence is "less significant" than the intrinsic record in determining the meaning of the claim language because of inherent limitations on the evidence's reliability. *See Phillips*, 415 F.3d at 1318–19. Thus, to the extent that the Court considers extrinsic evidence, it does so in the context of the intrinsic evidence and is cognizant of "the flaws inherent" in such extrinsic evidence. *Id.* at 1319.

**ANALYSIS**

**A. The '878 Patent**

The '878 patent, entitled "Watering Indicator," issued on August 19, 2008, and was assigned to Encap. ('878 Patent, ECF No. 112-1.) The parties' sole dispute concerns the term "Indicator," as it appears in the first claim of the patent. The parties propose the following interpretations:

| Term | Encap's Construction | Scotts' Construction | Court's Construction |
|------|---------------------|---------------------|---------------------|
| Indicator | A water absorbing material used to visually signal when it is time to stop watering seeds, soil and/or plant life by its ability to distinctively increase in size as it absorbs moisture. This distinctive change in relative size provides a visual when-to-water reference guide and/or signal. | A cross-linked polymer that has the ability to repeatedly increase and decrease in relative size as it absorbs and releases water, respectively. | A material that has the ability to repeatedly increase and decrease in relative size as it absorbs and releases water, respectively. |

The '878 patent contains only two claims: Claim 1, the independent claim, describes a method for signaling when to "stop watering," (4:23–24) and Claim 2, the dependent claim, describes a method for signaling when "to start watering again" (4:31–32). In Claim 1, the Indicator "absorb[s] moisture and change[es] to a distinctively different size and/or shape (ie. swell[s]) that is visually noticeable," (4:20–22), while in Claim 2, the Indicator "releases water during the drying process (i.e. is deactivated), changes to a distinctively smaller size and/or different shape," (4:28–30). Although Claim 1 does not explicitly require the Indicator to release water and shrink, Scotts proposes that the Indicator must have the *ability* to do so. The Court agrees.

Under Encap's proposed construction, the term "Indicator" would have to have a different meaning in each Claim. In Claim 1, Encap construes the term to mean a material that signals when it is time to stop watering seeds, soils and/or plant life by its ability to increase in size as it absorbs water. But for Claim 2, "Indicator" must be a material that signals when it is time to start watering because the material has shrunk in size as it has released water. This violates the general principle of claim construction that the same claim terms are generally given the same construction. *Aventis Pharmaceuticals Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1380 (Fed. Cir. 2013); *see also Omega*

*Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."); *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("We apply a presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."). Moreover, the requirement that the Indicator have the ability to decrease in size is essential if the Indicator is to perform the function assigned to it. It cannot signal the need to stop watering by increasing in size unless it also has the ability to decrease in size after the required amount of water has been provided. In other words, the need to decrease, as well as increase, in size is implicit in the claim language itself.

This requirement, implicit in the claim language, is made explicit in the specification which describes the field of the invention as: "[a] water absorbing material (Indicator) used to visually signal when it is time to *start and stop* watering seeds, soil, and/or plant life by the Indicator's ability to distinctively *increase/decrease in relative size* as it *absorbs/releases moisture* respectively. This distinctive change in relative size provides a visual when-to-water reference guide and/or signal." (1:5–10.) (emphasis added). Thus, although Encap inserted the word Indicator after "water absorbing material," the full paragraph signals that the Indicator also releases moisture so that it may serve as a "when-to-water reference guide." (1:10.)

The "Summary of the Invention" section again defines the term:

The present invention relates to the use of water absorbing/*releasing* materials (Indicators) to serve as the visual indicators for people to know when they are to start and stop watering their lawn. It is an object of the present invention for the Indicator to, when dry, to be of a small relative size when applied on and/or near seed and/or plant life. It is an object of the present invention for the applied Indicator to swell and

6

increase in size to a distinctively larger relative size (serving as the Indicator) when the soil, seed, and/or plant life are watered to desired levels. *It is an object of the present invention for the process to be repeatable and predictable*.

(2:17–27.) (emphasis added). Here, Encap defines Indicators as "water absorbing/releasing materials" and describes a "repeatable and predictable" process in which the Indicator increases and decreases in relative size. The "Summary" section further describes the invention as follows: "The present invention relates to a method for determining when to *start and stop* watering seeds" (2:38–39) (emphasis added); "When the distinctively larger size Indicator is present, this signals the user to stop watering. Moisture is then released by the Indicator, soil and/or seeds as they dry. The need for additional watering is signaled when the Indicator is reduced to a distinctively smaller sized Indicator" (2:43–47); "It is an object of the present invention for this method to be repeatable" (2:47–49); "It is an object of the present invention for the Indicator to be applied in addition to the seed, soil, and/or plant life. This indicator has the *capacity* to repeat this cycle, providing repetition *as required* for establishment" (2:53–56) (emphasis added). Notably, repetition is described not only as an "object" of the invention, but also as *required* to achieve the end described in the Background of the Invention: the establishment of grass seed or other plant life. (2:1–7.)

Encap accuses Scotts of importing a limitation from an embodiment of the invention described in the specification into its claim construction. But the requirement that the Indicator have the ability to both increase and decrease in size is not taken from one of the embodiments of the invention; it is taken from the description of the invention as a whole. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318–19 (Fed. Cir. 2006); *SciMed Life Sys., Inc. v. Advanced Cardiovascular*

*Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."); *see also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007) (specification's description of a "critical element" found limiting). Here, the specification explicitly makes clear that the term "Indicator" means a material that has the ability to repeatedly absorb and release water. The Indicator's ability to release water is essential to the purpose of Encap's invention; if the Indicator cannot shrink, then it cannot produce a repeatable process or signal when to begin watering again. In other words, it cannot serve as a "when-to-water reference guide," a phrase that Encap itself includes in its definition of Indicator.

Encap's claim differentiation argument is also unavailing. The doctrine of claim differentiation "refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). Claim differentiation merely creates a presumption, however, and the doctrine "will be overcome by a contrary construction dictated by the written description or prosecution history." *Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citation omitted). In *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1341–42 (Fed. Cir. 2010), the Federal Circuit upheld the construction of the term "non-radioactive moiety," which the district court had defined in an independent claim as a moiety that "*can* be detected with a preformed detectable molecular complex." *Id.* at 1342. The patentee argued that this definition rendered superfluous a dependent claim which added "a preformed detectable molecular complex" to the independent claim. *Id.* The Federal Circuit held that the doctrine of claim differentiation did not apply because under the district court's construction, the independent claim was broader than the dependent claim. *Id.* The court observed that "the district court's construction imposes no requirement that a

preformed detectable molecular complex is actually present in [the independent claim]; rather, it simply requires the "non-radioactive moiety" to be capable of performing a function . . . ." *Id.* The court further explained that the independent claim was broader because unlike the dependent claim, it could be infringed even in the absence of a preformed detectable molecular component. *Id.* Similarly here, the court's construction only requires that the Indicator in Claim 1 be *capable* of releasing water and shrinking. Claim 1 may still be infringed even if the material at issue does not *actually* release water or shrink. Claim 1 is therefore broader than Claim 2, and the doctrine of claim differentiation does not apply. In any event, the plain import of the specification would be sufficient to overcome a claim differentiation presumption.

The parties' second dispute concerning the '878 patent is whether the definition of Indicator is limited to cross-linked polymers. Unlike linear polymers which dissolve in water, cross-linked polymers have the ability to absorb up to 400 times their weight in water. *See* American Soil Technologies, Inc., *Frequently Asked Questions: Polymers*, http://www.nutrimoist.com/faq/index.asp#1 (last visited June 3, 2014). These polymers have a "crystal" structure and take on the consistency of a gel when they absorb water. *Id.* The only embodiment described in the '878 patent utilizes these polymers as the Indicator. In describing the embodiment, Encap explains that cross-linked polymers are advantageous because they can "swell to visible size in various, and desirable increments associated with seed moisture needs. . . . [and] [a]s the soil surface dries out . . . release[] the moisture until the Indicator is less visually noticeable." (3:23–25, 3:30–32.) Specifically, within a 20-30 minute period of watering, cross-linked polymers "can swell to form a pea size or larger granule that is visible from a five-foot distance." (3:25–27.) Although "cross-linked polymer" does not appear in the claims, Scotts contends that cross-linked

polymers are an essential feature of the invention as a whole and that the specification disclaims the use of any other material.

A review of the specification in its entirety weighs against limiting the definition of Indicators to cross-linked polymers. The Abstract, Field of the Invention, and all but two sentences of the Summary of the Invention use broad or indefinite language when describing the composition of the Indicator. As noted above, Encap directly defines Indicator as a "water-absorbing material" and a "water absorbing/releasing material." (1:5; 2:17–18.) In the Summary of the Invention, Encap describes "the present invention" and lists several "objects of the present invention." Most of these descriptions simply refer to the Indicator as "Indicator." *E.g.* "The present invention relates to a method for determining when to start and stop watering seeds. *An Indicator* is applied on top of the seed and/or soil . . . ." (2:36–39.) (emphasis added).

Two of the "objects of the invention" address the Indicator's physical composition: "[i]t is an object of the present invention for the water absorbing material to comprise cross-linked polymers. It is an object of the present invention for the cross-linked polymer to be potassium or sodium based polymers." (2:28–31.) While this language emphasizes Encap's preference for cross-linked polymers, it does not unequivocally limit the invention to cross-linked polymers. It is not a direct description of the "present invention." *Cf. Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000) ("[T]he specification actually limits the invention to structures that utilize misaligned taper angles, stating that "[t]he present invention utilizes [the varying taper angle] feature.") Instead, the phrases describe two objects, or goals, of the invention. *Cf. Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) (holding that statement describing the "object of the invention" merely stated "one of several objectives that can be achieved through the use of the invention"). Encap's use of the

10

word "object" to describe the composition of the Indicator is confusing because patentees typically use the phrase "object of the present invention" to describe an outcome. *See, e.g., Netcraft*, 549 F.3d at 1397 ("[An] object of *the present invention* is an Internet billing method which is cost effective for transactions having transaction amounts ranging from pennies to a few dollars."). Nonetheless, it would not have been clear to one of ordinary skill in the art that the language limited the invention to cross-linked polymers, as other "objects" of the invention were not essential features of the invention. For example, the Summary states that "[i]t is an object of the present invention for the indicator's change to be visually noticeable to the naked eye from a distance of approximately five feet or more." (2:65–67.) Since a size-changing Indicator that is visible from only four feet away could still serve as a when-to-water reference guide, this "object" is not an essential feature of the invention. Similarly, a material that is not a cross-linked polymer, at least in theory, could visibly change size as it absorbs and releases water. Scotts contends that only a cross-linked polymer could satisfy all the other "objects" of the invention, but Scotts does not cite any evidence in support of this assertion and the patent itself does not make such a claim. Regardless, an embodiment of the invention need not achieve every object of the invention. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908–09 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives"); *Northrop Grumman*, 325 F.3d at 1355.

Scotts also points to the Detailed Description of the Invention, which states that "[t]he present invention visually shows which areas have received more water than others, as the Indicator will not be present in areas receiving less water." (4:1–4.) Scotts argues that only a cross-linked polymer "will not be present" when it is dry. Again, although cross-linked polymers meet this description, the record

11

lacks evidence that one of ordinary skill in the art would not be aware of other capable materials.

Finally, Scotts argues that the Figures depicting cross-linked polymers disclaim the use of any other material, and that at a minimum, they disclaim mulch as an Indicator. Figure 1 "shows unwatered seeds, mulch, and Indicators on soil," while Figure 2 "shows watered seeds, mulch, and Indicators on soil." (4:5–6, 4:8– 9.) In Scotts' view, since Encap distinguished between mulch and Indicators, it is precluded from arguing for a definition of Indicator that covers mulch. In addition, both Figures are described as having "the Indicators of the present invention." (3:3–6.)

The Federal Circuit "has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claims to that depicted scope." *Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1376–77 (Fed. Cir. 2006). Thus, the fact that only the preferred embodiment is depicted does not necessarily limit the claims. The Figure labels are also inconsistent; the cross-linked polymers are first described specifically as "the Indicators of the present invention," but later they are described more broadly as "Indicators." In the full context of the patent, which contains multiple definitions of Indicator expressed in broader terms, this labeling is not enough to constitute a clear disclaimer. Scotts also cites *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.* 93 F.3d 1572, 1577–78 (Fed. Cir. 1996) for the proposition that when the specification describes a particular element as distinct from another element, the patentee cannot argue a broader construction to cover both elements. In *Ethicon*, the claim's preamble placed the lockout mechanism of a surgical stapler "in a staple cartridge," and "staple cartridge" was used in the specification to describe a particular element of a figure. *Id.* The patentee later argued that "staple cartridge" should not be limited to the element identified in the figure and additionally included the firing means. *Id.* at 1578. The Federal Circuit rejected the patentee's argument because "[t]he specification unambiguously describe[d] the staple cartridge as a separate element distinct from the firing means." *Id.* The Court

does not find *Ethicon* applicable here. In *Ethicon*, the patentee applied two different definitions to the same object; it would have been inconsistent for the definition of staple cartridge to be confined to one element and to include additional elements. Here, it is not inconsistent for Encap to distinguish between mulch and Indicators in one embodiment of the invention but argue that in another embodiment, the Indicators are made from a mulch-like material. In fact, even if a mulch served as the Indicator, it could still be mixed with other mulch, as depicted in the Figures. The Court finds no disclaimer here.

The prosecution history also contains no clear disclaimers. Although Encap once referred to the Indicators as "crystals" when distinguishing another form of prior art (Helbling), this passing reference is not an unequivocal disclaimer. Encap distinguished Helbling because it taught mixing cross-linked polymers into the soil, whereas Encap's patent taught that the polymers had to be placed at the surface of the soil. (Sept. 2007 Response to Office Action at 5, ECF No. 112-15.) Thus, Encap did not clearly limit its invention to "crystals" or cross-linked polymers.

Encap may have envisioned that its invention would principally, if not exclusively, utilize cross-linked polymers as the Indicator. The extrinsic evidence cited by Scotts certainly indicates that Encap has exclusively used cross-linked polymers in its own products. But "[a]bsent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003). The Court finds no clear disclaimer concerning the composition of the Indicator, but as noted above, the Indicator material must be able to repeatedly increase and decrease in relative size as it absorbs and releases water, respectively.

## B. The '183 Patent

The '183 patent, entitled "Colored or Fragranced Horticultural/Agricultural Products," issued on July 2, 2013, and was assigned to Encap. ('183 Patent, ECF No. 112-2.) The parties dispute three terms as they apply to Independent Claim 8 and Dependent Claims 10, 12, and 14:

### 1. Color Source

| Term | Encap's Construction | Scotts' Construction | Court's Construction |
|------|---------------------|---------------------|---------------------|
| "said color coming from a pigment and/or dye in said mulch product" | "Pigment" is a color which comes from a natural substance which gives color to animals and plants. "In" is used to indicate that someone or something belongs to or is included as part of something. Therefore the clause should be construed to mean "a color which comes from a natural substance which gives color to animals and plants and/or a dye which belongs to or is included as part of the mulch product." | The color comes from a colorant that has been added to the mulch product. | The color comes from a pigment and/or dye that has been added to the mulch product. |

Claim 8 provides "a method of determining moisture content of soil and/or seed at soil surface" based on the "changing color intensity" of mulch product when moisture is added to the mulch product. (16:53–62.) The parties dispute whether the color must be added to the mulch product or whether "pigment" includes inherent colors of mulch. The plain meaning of "in" provides little guidance, as it has no temporal component; it does not indicate whether the color was always in the mulch or has been added and is now in the mulch. "Pigment" could also refer to an inherent pigment or an added pigment. The court instead looks to the specification and concludes that the specification contains a

clear disclaimer of inherent pigment. The following lines of the specification unmistakably teach adding a color to the mulch product:

> "The present invention relates to horticultural products and a method for making gardening products which have a dye or fragrance *added* to the products." (Patent Abstract) (emphasis added).

> The present invention relates to horticultural products and a method for making gardening products which have a dye or fragrance *added* to the products." (1:15–17) (Field of the Invention) (emphasis added).

> "It is a further object of the present invention to *provide* a dye being capable of changing colors in response to the moisture content added to the soil." (4:5–7) (Summary of the Invention) (emphasis added).

> "The present invention relates to a method for *adding* a color to a gardening product. Dyes are *added*, to a gardening product, such as, a mulch by homogeneously blending the colorant either before or at an agglomeration step." (5:49–52) (Summary of the Invention) (emphasis added).

> "The present invention *provides* dyes to seeds and mulches for color accents and for ease in determining where the products are located." (6:38–42) (Detailed Description of the Invention) (emphasis added).

> "The present invention uses a wide range of colorants for *coloring* the gardening product. Both liquid dyes and dry pigments can be used." (6:48–50) (Detailed Description of the Invention) (emphasis added).

> "The present invention further relates to a method for *adding* a color to a gardening product. Dyes are *added* to a gardening product, such as, a mulch by blending homogeneously if desired, the colorant with the mulch." (7:23–26) (Detailed Description of the Invention) (emphasis added).

Encap's repetitive descriptions of "the present invention," as contained in every relevant section of the patent, clearly state that the color is added to the mulch. The "pigment" is consistently described as a dry pigment that is added, not a natural or inherent pigment. (*See, e.g.*, 5:47–48, 6:48–59 ("All pigments and shades tested with the present invention colored the mulch product.".) Since the patent does not explicitly refer to a natural or inherent color in any section of the specification, these

descriptions constitute a clear disclaimer. *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347–49 (Fed. Cir. 2004) ("[T]he specification refers to data transmission "over" or "through" a telephone line roughly two dozen times. Nowhere does it even suggest the use of a packet-switched network.") The public is entitled to rely on these representations to ascertain the scope of Encap's invention. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (observing that based on the patentee's descriptions of "the present invention," "[t]he public [was] entitled to take the patentee at his word and the word was that the invention is a fuel filter").

Encap's argument that it did not consistently teach adding a color is unpersuasive. Encap cites several passages which state that "the present invention" relates to "a product and method for colored . . . products." Simply describing the mulch as "colored," however, does not explicitly teach that the color is a natural or inherent color of mulch, and it is not inconsistent with a product that has an added pigment or dye, as the specification repeatedly teaches. In other words, as a result of Encap's repeated references to added color, a person of ordinary skill in the art would understand "colored" to mean a product that has an added dye or pigment. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007) (holding that patentee's use of "composite material" without further reference to linear extrudate or pellet form on several occasions did not require broad construction where the specification had otherwise limited a synonymous term to linear extrudate or pellet form). Similarly, the Summary provides that "[i]t is an object of the invention for the mulch to have the color of the actual plant, flower, fruit or vegetable of a seed planted with said mulch." (5:1–3) Although the "actual plant" would have an inherent color, this does not necessarily teach that the mulch utilizes an inherent color, as opposed to a dye that aims to match the color of the actual plant. In addition, the Summary provides that "[t]he present invention relates to a colored mulch product comprising: a

16

material comprising a fiber, cellulose, clay, loam or sand and/or a combination of same; a binding agent; and a dye or pigment." (5:23–26.) If this passage suggests anything, it suggests that the mulch material is distinct from the dye or pigment, which further supports Scotts' position.

Encap also raises a claim differentiation argument because Claim 9 comprises "[t]he method of Claim 8 wherein said pigment and/or dye is added to the mulch product." (17:8–9.) But again, the plain import of the specification is sufficient to overcome the claim differentiation presumption. The specification repeatedly teaches that its invention relates to an added color. The court's construction of "added" color is necessary "to tether the claims to what the specification[] indicate[s] the inventor actually invented." *Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (holding that claim differentiation was overcome in part because of patentee's express descriptions that "the invention" had a single-piece body).

The prosecution history does not warrant a contrary conclusion. Encap initially proposed variants of the method claims ultimately issued in the '183 patent on December 8, 2011. (ECF No. 112-36.) From January 2001 to December 8, 2011, Encap had been pursuing, but ultimately cancelled, similar product claims under the same application. Scotts contends Encap distinguished prior art that did not teach adding a pigment or dye in the course of pursuing its product claims. For example, in a December 2002 Response to Office Action, Encap addressed the Examiner's objections to initial Claims 26–30, which related to "a colored mulch product wherein the dye indicates to the user the environmental condition of the soil where the mulch is placed." (Dec. 2002 Resp. at 13, ECF No. 112-31.) Encap distinguished Kananen in part because it "does not add a dye or pigment to the compost." (*Id.* at 14; *see also* March 2004 Resp. at 10, ECF No. 112-32 ("Edwards teaches against using mulch and does not teach adding a dye to a mulch which would indicate to a user environmental conditions");

May 2006 Resp. at 10 ("The use of [] chemicals on a mulch is not known in the art and this is what is new and novel about the claims of the present invention. The specification specifically describes the dyes that are selected which are added to the mulch [sic] change color based on the acidity, moisture, or chemical content of the soil.")). Encap argues that statements directed to its product claims do not apply to its method claims and that in any event, Encap disavowed the statements.

The prosecution history limits claim meaning when an applicant "clearly and unmistakably" disclaims claim scope or meaning. *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1342-43 (Fed. Cir. 2012). A disclaimer may arise from argument related to a cancelled or rejected claim. *See Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220–21 (1940) ("[A] claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent."). However, a disclaimer as to one claim may not apply to another claim if the claims are sufficiently distinct. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1331 (Fed. Cir. 2003) (declining to apply prior disclaimer to newly added claims that did not contain the same disputed claim term). Further, "an applicant can broaden as well as restrict his claims during the procedures of patent examination." *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007). To rescind a previous disclaimer, however, the patentee must have clearly disavowed the previous disclaimer. *See id.* at 1318 (observing that "an applicant cannot recapture claim scope that was surrendered or disclaimed" in a prior application unless "the prosecution history [was] sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be revisited").

Encap's product claims and method claims were part of the same patent application, and there is significant overlap between the cancelled claims and the issued patent, such that a reasonable competitor would have understood the two to be related. For example, the specification incorporates the language from the cancelled product claims when describing "the present invention." *Cf.* 4:47–50 with Encap Patent Application at 26, Claim 26, ECF No. 112-29 (both describing "a colored mulch product consisting essentially of; a material comprising a fiber cellulose, clay, loam, sand, and/or a combination of same; a binding agent; and a dye and/or pigment."). The product and method claims also state an equivalent purpose: to signal to a user the moisture content of the soil. *Cf.* 16:53–54, Claim 8 ("A method of determining moisture content of soil and/or seed at soil surface") with Encap Patent Application at 27, Claim 29, ECF No. 112-29 ("The colored mulch of Claim 26 wherein said dye assists a user in determining moisture content of soil.") Thus, although Encap's issued claims were method claims, the general public would have been justified in relying on disclaimers Encap made during the prosecution of its product claims.

The Court concludes that Encap's prior statements distinguishing Edwards and Kananen constitute clear disclaimers of naturally colored mulch. Encap even acknowledges that its product claims only included dyes and did not relate to naturally colored mulch. (Pl's Resp. Br. at 21, ECF No. 119.) In addition, the Court concludes that Encap did not explicitly renounce these disclaimers when it pursued its method claims. Encap asserts that it did so when it showed the examiner various bags of mulch at the interview session on December 8, 2011. Encap provided four samples of "colored" product, two of which were dry and two of which were wet, two samples of a product on the market that had no dye but changed color when wet, and four samples of a dyed product that did not change color when wet. (ECF No. 112-36.) Encap asks the court to infer that this helped overcome the

examiner's concern that its new claim language may read on the inherent properties of clay/coir mulches. (*Id.*) But even if Encap ultimately persuaded the examiner that all mulches do not inherently change color, this simply means that Encap's method claims overcame an obviousness objection—not that the claims necessarily include mulches that do not have an added pigment or dye. The examiner's notice of allowance does not explain her rationale for allowing the claims. (ECF No. 120-5.) More importantly, the prosecution history lacks any clear statement from Encap that could reasonably apprise the public of an enlarged claim scope beyond added dyes and pigments. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (limiting patentee to restrictive claim construction because he never retracted his previous disclaimers on the record).

The outcome would not be different even if Encap's prior disclaimers did not apply to its method claims. The prosecution history is ambiguous at best as to whether Encap's invention includes natural pigments, and this history is not enough to overcome the clear import of the specification. *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1139–40 (Fed. Cir. 2003). The interested public is entitled to take Encap at its word, and its word was that the method claims relate to *added* dyes and pigments.

### 2. Chemical Reaction

| Term | Encap's Construction | Scotts' Construction | Court's Construction |
|------|---------------------|---------------------|---------------------|
| "changing color intensity of said mulch product" | Changing the degree of color of the mulch product, the changing color intensity of the mulch product having a relationship to the moisture content of the surface of the soil and/or seed, indicating | Causing a chemical reaction that imparts a change in color intensity to the mulch product. | Causing a chemical reaction that imparts a change in color intensity to the mulch product. |

The parties dispute whether the mulch's "change in color intensity" must be caused by a chemical reaction. Although the specification does not refer to a "chemical reaction," Scotts again contends that Encap limited the scope of its claim during early prosecution of its product patents. For example, in an October 2005 Response to Office Action, Encap observed that initial Claims 26–30, among other claims, "all involve a chemical reaction." (Resp. at 10, ECF No. 112-44; *see also* May 2006 Resp. at 10, ECF No. 112-35 ("The reasons for the color changing is a chemical process as stated above which would allow the dye to change color based on the acidity, moisture, or chemical content of the soil.")). As noted above, there is substantial overlap between Encap's product claims and method claims. The public was therefore entitled to rely on Encap's earlier prosecution disclaimers. The court concludes that Encap's disclaimers limiting the color change to chemical reactions were clear and unmistakable, and Encap points to no statement that constitutes a clear renunciation of these disclaimers.

### 3. Soil Surface

| Term | Encap's Construction | Scotts' Construction | Court's Construction |
|---|---|---|---|
| "at surface of said soil" | The top of the soil where it is visually noticeable to a person. | This clause should be given its ordinary and customary meaning. | This clause should be given its ordinary and customary meaning. |

There does not appear to be any real dispute between the parties regarding this clause, as Scotts does not contest that the mulch product is visually noticeable. As noted at the *Markman* hearing, there is no need for further construction here.

**CONCLUSION**

The disputed claim language is construed as noted in the far right hand column of each above chart where indicated for the reasons set forth above.

**SO ORDERED** this __9th__ day of July, 2014.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court