UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ENCAP, LLC,

        Plaintiff,

v.                                                        Case No. 11-C-685

THE SCOTTS COMPANY, LLC, et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Encap, LLC (Encap) sued Defendants The Scotts Company, LLC, The Scotts-Miracle Grow Company, LLC, and OMS Investments, Inc., (collectively, "Scotts") for infringement of four of Encap's patents and misappropriation of its trade secrets. Before the court is Scott's motion for summary judgment on Encap's claim for misappropriation of trade secrets. For the reasons set forth below, Scott's motion will be granted.

## BACKGROUND

Encap claims to have invented a number of novel platform technologies that have revolutionized the lawn and garden industry. These inventions are described in a series of patents that Encap has obtained over the course of the last fifteen years, four of which Scotts is alleged to have infringed. One of the patents at issue, for example, describes combining in capsule form grass seed with a soil conditioner, inorganic fertilizer, growth enhancer, a binder and/or anti-fungal agent so that the respective materials cooperate with each other to promote germination and plant growth. (Abstract to '259 Patent, Am. Compl., Ex. 1 at 1, ECF No. 59-1.) Another describes a water

absorbent material or indicator that, when spread on the surface of a newly seeded area, signals when it is time to water the area by increasing or decreasing in size. (Abstract to '878 Patent, Am. Compl., Ex. 2 at1, ECF No. 59-2.) A third describes the use of an agglomerated/granulated mulch as a seed carrier so that the mulch does not separate from the seed when it is planted. (Abstract of '513 Patent, Am. Compl., Ex. 3 at 1, ECF No. 59-3.) Finally, Encap's '183 Patent describes a way of determining the moisture or chemical content, or acidity of the soil by changes in color intensity or fragrance of a mulch. (Am. Compl., Ex. 4 at 8, ECF No. 59-4.)

The products embodying these and other Encap patents, which Encap describes as value-added specialty seed products, offered new opportunities for expanded sales and profits for those in the horticulture and agriculture industries. Encap claims that it developed as a trade secret a detailed plan for exploiting those opportunities. Encap's plan was conditionally disclosed in a confidential information memorandum (CIM) delivered to Scotts and other industry leaders beginning in 2002. At about that time, Encap retained a company called Trans@active Partners, Ltd., to assist it in developing strategic partnership opportunities for achieving its goals. Although Trans@ctive has since ceased doing business and no longer has a copy of the non-disclosure agreement with Scotts, a log summary of its files states that in June 2002 Trans@ctive Managing Partner Robert Sexauer sent a copy of Encap's CIM to Mark Schwartz, Scotts' Senior Vice President for Strategic Planning, after Schwartz signed and returned a non-disclosure agreement. While Scotts initially expressed interest in Encap's products, platform technologies and marketing strategies, it later stopped communicating with Trans@ctive and Encap without explanation. Then in 2006, Scotts re-initiated contact with Encap and executed a ten-year confidentiality agreement. Further correspondence and discussions followed, but again no agreement.

In the meantime, Scotts was developing its own value-added specialty seed products. In August 2007, Scotts field tested Scotts' Turf Builder Grass Seed with Water Smart Coating. In 2008, Scotts applied for trademarks for the terms "Water Smart" and "EZ Seed." By 2009, Scotts was selling its EZ Seed product and coated Turf Builder (or Water Smart) Grass Seed "in a consistent, and recognizable manner that was presented in Encap's 2002 CIM." (Decl. of Michael Krysiak ¶ 26, ECF No. 136.) Scotts touted its new offerings and highlighted its own research and development program in its 2008 Annual Report:

> Research & Development will be front-and-center again in 2009 with the introduction of two of the most innovative grass seed products in decades. New Turf Builder Water Smart Grass Seed is a full line of premium grass seed products that provide consumers high-performance seed wrapped in a revolutionary super-absorbent coating. The patented coating allows the seed to absorb up to 40% more water than ordinary seed. As a result, the seed needs to be watered less frequently, which allows consumers to more easily succeed in growing a beautiful Scotts lawn.

(*Id.* at 12.)

Encap argues that "Scotts' Turf Builder Grass Seed (coated seed) product, and its marketing focus and business positioning are all rooted in Encap's CIM." (Br. in Opp. at 8, ECF No. 134.) Encap further contends that "Scotts switched the majority of its product line over to the products disclosed in the CIM and adopted the disclosed business strategies with respect to those products." (*Id.*) In doing so, Encap claims that Scott not only infringed its patents but also misappropriated its trade secret.

## ANALYSIS

The parties agree that Encap's misappropriation of trade secret claim is governed by Wisconsin law. Section 134.90 of the Wisconsin Statutes defines the phrase "trade secret" and sets

3

out the remedies available to one whose trade secrets are misappropriated. The statute defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique or process" that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Wis. Stat. § 134.90(1)(c). In addition, the owner must undertake reasonable efforts to maintain the secrecy of the information. *Id.*; *see also Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 851–52, 434 N.W.2d 773, 777 (1989).

In other words, the key element of a trade secret is secrecy—the information must be neither generally known nor readily ascertainable by proper means, and it must be kept secret. "A trade secret has value only so long as the knowledge involved can be concealed." *Rototron Corp. v. Lake Shore Burial Vault Co., Inc.*, 553 F. Supp. 691, 698 (E.D. Wis. 1982). With patents, the opposite is true:

> In order to foster invention and reward those who expand human knowledge, our nation grants a monopoly for the life of a patent on the invention or process disclosed in the claims. But the price for this reward is full disclosure. The knowledge passes into the public domain, and thereafter the patentee's only protection is that afforded under the patent law.

*Id.* The distinction is crucial in this case because Encap's purported trade secret is intertwined with its patents. To the extent the information Encap claims as a trade secret has been disclosed or is easily ascertainable from its patents, it cannot be a trade secret. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484 (1974) ("By definition a trade secret has not been placed in the public domain."). Likewise, to the extent Encap's purported trade secret is manifest in its own marketing efforts for its patented products, it also cannot be a trade secret. Here, Encap has failed to identify with particularity any information that is not already apparent, given its own public disclosures.

4

In a previous order denying Encap's motion to seal its CIM, the Court described its contents as follows:

> The memo contains a background of the company, photos of its products and its plant in Green Bay, and a basic description of the products and their potential role in the markets. The document is ten years old and does not contain any apparent trade secrets or underlying data, such as chemical formulas or manufacturing processes. Nor are there disclosures of any but the most basic marketing strategies, most of which are based on publicly available information, such as economic trends (as of 2002) and population.

(Order Denying Encap's Mot. to Seal at 1, ECF No. 26.) Encap has offered nothing since that order was entered that leads the Court to a different conclusion.

In essence, Encap's claimed trade secret is a general marketing plan for its new products. But a marketing concept or a new product idea, once it is implemented, cannot be a trade secret.

> Trade secret law is designed to protect a continuing competitive advantage, which a company enjoys due to confidential information it possesses, from destruction due to disclosure by a departed former employee. A marketing concept does not by confidentiality create a continuing competitive advantage because once it is implemented it is exposed for the world to see and for competitors to legally imitate.

*Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir. 1976). The United States District Court for the Northern District of Illinois reached the same conclusion applying Illinois law in *Om v. Weathers*, No. 91-C-4005, 1992 WL 151553 at *6 (N.D. Ill. June 23, 1992): "Legal protection for advertising slogans and marketing concepts 'is not found under the law of trade secrets.'" (quoting *Richter*, 529 F.2d at 900); *see also Silipos, Inc. v. Bickel*, No. 06 Civ. 2205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("[T]rade-secret protection does not extend to information regarding market strategies." (internal quotation marks omitted)).

Even if marketing plans and sales strategies could constitute a trade secret, Encap has failed to identify with any particularity what the secret information is that its marketing plan and/or

5

business strategy contains. It is not enough for a plaintiff to generally describe the kind of information it claims as a trade secret or explain why it is valuable. The party asserting such a claim must tell the party it accuses of misappropriating its trade secret specifically what the secret is. If it does not, how can the other party defend itself? *See Marine Travelift, Inc. v. Marine Lift Systems, Inc.* No. 10-C-1046, 2013 WL 6255689, at *5 (E.D. Wis. Dec. 4, 2013); *see also IDX Systems Corp. v. Epic Systems Corp.,* 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992)).

In its response brief, Encap calls its trade secret "a strategic business plan in the retail lawn and garden industry that was a compilation producing a strategic understanding of unmet market and consumer needs." (Pl.'s Resp. Br. 1, ECF No. 134, citing Pl.'s Answer to Interrog. No. 13 at 12–30, ECF No. 129-3.) Somewhat more specifically, Encap says

> [T]his strategic business plan was . . . a roadmap as to how to transform the lawn and garden industry by going beyond the seed itself by identifying business strategies for specialty seed products. This was accomplished through a unified business strategy that identified markets for and educated retail buyers about value added components that make life easier for their consumer and the seed itself; disclosed how to influence consumer behavior though smart products that go beyond the seed; and promoted value-added specialty seed products in a way that the company producing such products will be viewed as innovative and revolutionary so that company can come to realize that more value means higher margins and more profits.

(Pl.'s Resp. Br. 1–2.)

Still, what Encap has provided is a description of what it claims to be a trade secret, not the trade secret itself. At oral argument, the court asked counsel for Encap to state what the trade secret actually is. Counsel referenced a section of the CIM which noted the need for landscape workers

6

to work efficiently because of the seasonal nature of the work. But as the court noted, the fact that workers need to be efficient is not a trade secret. This type of very basic and vague idea cannot be a trade secret. *See Composite Marine Propellers, Inc.*, 962 F.2d at 1266 (rejecting claim that "marketing plans and strategies" constituted trade secret and observing plaintiff "cannot mean that the idea of making marine propellers and selling them through the usual channels in the boating industry is its trade secret").

Encap alleges that Scotts misappropriated its trade secret sometime after August 2007. (Br. in Opp. at 7, ECF No. 134.) By that time, several of Encap's patents had been issued, or the applications published, and Encap had been selling its own products embodying the patents for more than five years. As Scotts' chart showing the various aspects of Encap's purportedly secret business strategy shows, all of the information that Encap claims was confidential had already been disclosed in the patents that had been issued or in the literature Encap used to market its own products. (Br. in Supp. at 21–23, ECF No. 126.) The general information about potential customers, including the numbers of landscapers/lawn care establishments, established golf courses, schools and universities, and homeowners with lawns, was readily available from the public sources cited by Encap in the CIM. None of the information is customer specific or concerned specific sales strategies beyond communicating the advantages in ease and efficiency of Encap's products to the target audiences.

The cases cited by Encap in support of its contention that this information could amount to a trade secret are readily distinguishable. For example, *Minnesota Mining & Manufacturing Co. (3M) v. Pribyl*, 259 F.3d 587 (7th Cir. 1991), a case heavily relied on by Encap, involved a more than 500-page manual consisting of "operating procedures, quality manuals, trade manuals, process standards and operator notes for using 3M's equipment that makes resin sheeting." *Id.* at 596. The manual disclosed specific proprietary processes regarding cleaning procedures, temperature settings,

7

safety protocols and equipment calibrations. *Id.* In *Centrifugal Acquisition Corp. v. Moon*, 849 F. Supp. 2d 814 (E.D. Wis. 2012), the trade secret concerned a proprietary process for spin casting battery terminals and had been developed over twenty years of "trial and error." *Id.* at 820–21. As the court noted, "[a]nyone can try their hand at spin casting a battery terminal, but the end result would not be good enough to compete with terminals made using the Proprietary Process." *Id.* at 832. The trade secret in *Moon* also involved customer lists, vendor lists and pricing and margin information, all of which the court found was not generally known or readily ascertainable, and over which secrecy had been maintained. *Id.* at 819–21. And in *Edgenet Inc. v. GSI AISBL*, 742 F. Supp. 2d 997 (E.D. Wis. 2010), the plaintiff's master collection and spreadsheet compiled detailed product data that was "***more than*** just a compilation of public data." *Id.* at 1026 (emphasis added). Because the perhaps publicly available data was compiled in a unique way, the court held (at the motion to dismiss stage) that it was plausible that the spreadsheet was "not readily ascertainably by reason of being compilations." *Id.*

Rather than a detailed proprietary process or list of raw data compiled in some special way, the CIM consists of very general information about the market for horticultural and agricultural products and touts the advantages of Encap's products. The cases relied upon by Encap involve far more specific information than any of the information Encap has identified here. They do not provide the support Encap's claim needs to survive. Accordingly, and for the reasons set forth above, Scotts' motion for summary judgment is granted and Encap's claim for misappropriation of trade secret is dismissed.

**SO ORDERED** this ___28th___ day of August, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
